Granath v Monroe County (2026 NY Slip Op 01586)

Granath v Monroe County

2026 NY Slip Op 01586

Decided on March 19, 2026

Court of Appeals

Wilson, Ch. J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on March 19, 2026

No. 17 

[*1]Gary A. Granath et al., Appellants,
vMonroe County, et al., Respondents.

Stephen G. Schwarz, for appellants.
Alissa M. Brennan, for respondents.
City of New York, amicus curiae.

WILSON, Chief Judge:
Plaintiffs—Gary and Lorraine Granath—filed this lawsuit against defendants Monroe County, the Monroe County Sheriff, and Deputy Sheriff Khadija Fong to recover damages for the accident-related injuries they sustained when a vehicle driven by Deputy Fong collided with their car at an intersection. It is undisputed that Deputy Fong crossed the intersection against a red light while driving an emergency vehicle engaged in an emergency operation. The issue is whether the trial court properly granted defendants' motion for summary judgment, dismissing the Granaths' complaint, on the ground that Deputy Fong did not act with reckless disregard for the safety of others (see Vehicle and Traffic Law § 1104). Viewing the facts in the light most favorable to the Granaths, we affirm.I.

Deputy Fong's vehicle collided with the Granaths' car at the intersection of Ayrault Road and Turk Hill Road in Perinton at approximately 5:00 p.m. on November 25, 2019. On the evening of the accident the sky was clear, there was no precipitation, and the roads were dry. Before the collision, Deputy Fong and two other officers, Deputies Palermo and Bott, each in the same parking lot but in three separate vehicles, received a call to respond to an unrelated motor vehicle accident with heavy damage and unknown injuries. Driving her assigned vehicle, Deputy Fong headed towards the location of the motor vehicle accident driving westbound on Ayrault Road. Deputies Palermo and Bott followed.
The Granaths were driving southbound on Turk Hill Road. As they approached the intersection of Turk Hill Road and Ayrault Road, they had the green light. Before crossing the intersection, Mr. Granath, who was driving, slowed down to about 30-35 m.p.h. Deputy Fong was driving westbound on Ayrault Road and, as she approached the intersection of Ayrault Road and Turk Hill Road, the light for westbound traffic was red. Ayrault Road westbound contains three [*2]lanes: a right turning lane, a center lane, and a left-hand only turning lane. Because there were cars in the right and center lanes, Deputy Fong maneuvered either into the left-hand only turning lane or the oncoming eastbound traffic lane. Deputy Fong slowed down when she reached the intersection, looked to her left to observe approaching northbound traffic on Turk Hill Road, came to a complete stop at least once, and waited for northbound traffic to yield to her before proceeding into the intersection. It is also undisputed that, before Deputy Fong entered the intersection, she turned on her emergency lights.[FN1]
Deputy Fong testified that she "looked at all sides of the intersection" and, specifically, that she looked to her right twice, in the direction of southbound traffic, before proceeding through the intersection. However, the Granaths contend that either Deputy Fong did not look to her right to observe southbound traffic from Turk Hill Road, or if she did, her view was obstructed. Mr. Granath testified that he was familiar with the intersection based on his former job as a school bus driver and that three of the corners of the intersection "are blind." Sergeant MacKenzie, the officer investigating the collision, testified that he believed both Deputy Fong and the Granaths' views of the intersection "could have been obstructed." Because we take the evidence in the light most favorable to the Granaths, we assume that Deputy Fong either did not look to her right before entering the intersection, or that her view of southbound traffic was obstructed.
It is also disputed whether Deputy Fong engaged her siren or air horn at any point before, or while, she crossed the intersection. Deputy Fong testified that she activated her air horn "multiple times" as she entered the intersection. Deputy Palermo, who was directly behind Defendant Fong, stated that Deputy Fong did not utilize her air horn at the time she was proceeding through the intersection. Deputy Bott testified that she did not recall hearing an air horn. The Granaths both testified that they did not hear an air horn. Again, for the purposes of this appeal, we assume she did not use her air horn or siren.
According to testimony by all three deputies, when a deputy discretionarily decides to engage in "emergency operation," Monroe County Sheriff's Department ("MCSD") policy requires the deputy to call in a "Code 77" to advise the dispatcher. MCSD policy also requires that, when deputies engage in emergency mode, they activate their lights and sirens [FN2]. It is undisputed that Deputy Fong did not call in a "Code 77" to the dispatch at any point before the accident.
Supreme Court granted defendants' motion for summary judgment and dismissed the Granaths' complaint. The Appellate Division affirmed, holding that defendants established prima facie entitled to summary judgment, and in opposition the Granaths failed to raise a triable issue of fact as to whether Defendant Fong acted recklessly (237 AD3d 1595, 1595 [4th Dept 2025]). The court reasoned that that "[Deputy] Fong took several precautions before proceeding into the intersection against the red traffic signal, including bringing her vehicle to a complete stop, looking [*3]in all directions, activating her emergency lights, and proceeding slowly through the intersection" (id.). Two dissenting Justices concluded that "a jury could find based on the facts adduced in defendants' own submission that Fong entered the intersection in disregard of the traffic signal, that she failed to active her emergency lights and siren in the presence of an obstructed view, and that her actions were in violation of departmental policy, and consequently, that Fong acted with reckless disregard for the safety of others" (id. at 1598 [Bannister & Nowak, JJ., dissenting]). The Granaths appealed as of right pursuant to CPLR 5601 (a).II.

"To prevail on a motion for summary judgment, the movant must make a prima facie showing by submitting evidence that demonstrates the absence of any material issues of fact" (Nellenback v Madison County, 44 NY3d 329, 334 [2025], citing CPLR 3212 [b]). Once such prima facie showing has been made, the burden shifts to the opposing party to show there are material issues of fact requiring a trial (Bazdaric v Almah Partners LLC, 41 NY3d 310, 316 [2024], citing Alvarez v. Prospect Hosp., 68 NY2d 320, 32 [1986]). We must view the facts in the light most favorable to the nonmoving party, here, the Granaths (see Nellenback, 44 NY3d at 334).
Vehicle and Traffic Law § 1104 grants "the driver of an authorized emergency vehicle when involved in an emergency operation" a certain set of "special driving privileges" (Frezzell v City of New York, 24 NY3d 213, 217 [2014]). "Those privileges include passing through red lights and stop signs, exceeding the speed limit and disregarding regulations governing the direction of movement or turning in specified directions" (id., citing Vehicle and Traffic Law § 1104 [a], [b]). The Granaths do not dispute that, at the time of the collision, Deputy Fong was engaged in an "emergency operation" (see Vehicle and Traffic Law § 114-b) and, as such, was authorized to exercise section 1104's driving privileges. Furthermore, the Vehicle and Traffic Law grants police vehicles an additional right when engaged in an emergency operation: they do not have to activate their lights and sirens while exercising subsection (b)'s driving privileges (Vehicle and Traffic Law § 1104 [c]).
However, Vehicle and Traffic Law § 1104 (e) also specifies that, when exercising subdivision (b) privileges, drivers are not "protect[ed] . . . from the consequences of [their] reckless disregard for the safety of others" (see Kabir v County of Monroe, 16 NY3d 217, 223-24 [2011]). The reckless disregard standard is more demanding than ordinary negligence (Frezzell, 24 NY3d at 217, citing Saarinen v Kerr, 84 NY2d 494, 501 [1994]). More specifically, "for liability to be predicated upon a violation of Vehicle and Traffic Law § 1104, there must be evidence that the actor has intentionally done an act of an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow and has done so with conscious indifference to the outcome" (id. [internal quotation marks omitted], citing Saarinen, 84 NY2d at 501, and Prosser & Keeton, Torts § 34 at 213 [5th ed]). A " 'momentary judgment lapse' does not alone rise to the level of recklessness required of the driver of an emergency vehicle in order for liability to attach" (Szczerbiak v Pilat, 90 NY2d 553, 557 [1997], quoting Saarinen, 84 NY2d at 502).
It is undisputed that, before proceeding through the intersection, Deputy Fong slowed down, came to a complete stop at least once, observed northbound traffic, waited for that traffic to yield to her, and turned on her overheard lights. The Granaths contend that a jury could nonetheless find that Deputy Fong exhibited reckless disregard for the safety of others by failing to activate her air horn [*4]or siren; declining to call in a "Code 77" as required by MCSD policy; and proceeding into the intersection despite having an obstructed view of southbound traffic.[FN3]
We agree with the Appellate Division that defendants met their initial burden on their summary judgment motion and that, in opposition, the Granaths failed to raise a material triable issue of fact. Even assuming Deputy Fong failed to activate her air horn or siren, call in a "Code 77," or observe southbound traffic—either because her view was obstructed or she neglected to look to her right—taken together with the actions she undisputably did take—slowing down, stopping, activating her emergency lights and proceeding only once she observed northbound traffic yield to her—we cannot conclude that Deputy Fong, with "conscious indifference to the outcome," "reckless[ly] disregard[ed] . . . a highly probable risk of harm" (Frezzell, 24 NY3d at 217; see also Saarinen, 84 NY2d at 503; Szczerbiak v Pilat, 90 NY2d 553, 557 [1997]; compare Campbell v City of Elmira, 84 NY2d 505, 507-508, 511 [1994] [affirming the Appellate Division's order upholding a jury verdict imposing liability under section 1104 where evidence showed that the fire truck driver "intentionally violated the statutory mandate" when he failed to observe the color of the light, which was red; failed to activate his sirens;[FN4] admitted he did not look towards plaintiff's lane until he was in the middle of the intersection; and accelerated while crossing the intersection]).
As to whether Deputy Fong engaged her siren, Vehicle and Traffic Law § 1104 (c) requires most emergency vehicles exercising subsection (b)'s driving privileges—and thus benefitting from the higher "reckless disregard" standard— to use "audible signals" and to display "at least one red light." However, the statute explicitly exempts police vehicles from having to do the same. Deputy Fong's conduct must be evaluated with that exemption in mind [FN5]. Although the Granaths contend [*5]that internal MCSD policy required Deputy Fong to use audible signals while crossing the intersection, where "internal guidelines go beyond the [applicable] standard of . . . care [they] cannot serve as a basis for imposing liability" (Gilson v Metropolitan Opera, 5 NY3d 574, 577 [2005]).
Accordingly, the Appellate Division order should be affirmed, with costs.

RIVERA, J. (dissenting):

Drivers of authorized emergency vehicles are duty-bound "to drive with due regard for the safety of all persons," and they are liable for their reckless conduct (Vehicle and Traffic Law § 1104 [e]). Thus, an emergency vehicle driver who runs a red light without giving adequate warning and whose view of oncoming traffic is obstructed may be liable for damages they cause if they are reckless. Whether the driver is liable is generally a question for trial. Here, defendants could only prevail on their motion for summary judgment if they established that no reasonable jury could find that the driver was reckless. Defendants failed to meet that burden because, as the dissenting Justices below accurately describe, there remain disputed issues of material fact and credibility as to whether the emergency vehicle driver activated warning signals before entering the intersection, and whether they checked for and could see oncoming traffic. A jury could reasonably conclude that such failures constituted reckless behavior, and Supreme Court therefore erred by granting the defendants' motion for summary judgment.
I would reverse the Appellate Division order for the reasons stated by the dissenting Appellate Division Justices. I write separately to emphasize that the majority here misapplies our summary judgment standard by removing from the trier of fact resolution of disputed factual and credibility questions of recklessness. The result upsets our settled law and undermines the legislative balance of societal interests reflected in Vehicle and Traffic Law § 1104.***

"[T]he proponent of a summary judgment motion must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to demonstrate the absence of any material issues of fact" (Alvarez v Prospect Hosp., 68 NY2d 320, 324 [1986]; see also CPLR 3212 [b]). If the movant makes this showing, the burden shifts to the opposing party "to establish [*6]the existence of material issues of fact which require a trial of the action" (Alvarez, 68 NY2d at 324). A court reviewing a motion for summary judgment must view the facts in the light most favorable to the nonmoving party (see Ortiz v Varsity Holdings, LLC, 18 NY3d 335, 340 [2011]). Moreover, "[i]t is not the function of a court deciding a summary judgment motion to make credibility determinations or findings of fact, but rather to identify material triable issues of fact (or point to the lack thereof)" (Vega v Restani Constr. Corp., 18 NY3d 499, 505 [2012]). Since summary judgment "deprives the litigant of [their] day in court[,] it is considered a drastic remedy" (Andre v Pomeroy, 35 NY2d 361, 364 [1974]). Accordingly, summary judgment "should not be granted where there is any doubt as to the existence of" material and triable issues of fact, "or where the issue is arguable" (Sillman v Twentieth Century-Fox Film Corp., 3 NY2d 395, 404 [1957] [emphasis added] [internal quotation marks and citations omitted] [holding that the Appellate Division erroneously granted summary judgment since a triable issue of fact remained]).
Vehicle and Traffic Law § 1104 allows "[t]he driver of an authorized emergency vehicle" to disobey certain traffic laws when they are "involved in an emergency operation" (Vehicle and Traffic Law § 1104 [a]). Specifically, as relevant here, the driver may "[p]roceed past a steady red signal, a flashing red signal or a stop sign, but only after slowing down as may be necessary for safe operation" (id. § 1104 [b] [2]). The driver may also "[d]isregard regulations governing directions of movement or turning in specified directions" (id. § 1104 [b] [4]).
In enacting Vehicle and Traffic Law § 1104, the legislature balanced societal interests in public safety and the risk of increased danger caused by swift responses to emergencies, and it limited emergency vehicle drivers' liability to reckless behavior. To reflect that balance, Vehicle and Traffic Law § 1104 privileges "shall not relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons, nor shall such provisions protect the driver from the consequences of [their] reckless disregard for the safety of others" (id. § 1104 [e]). As this Court explained in Campbell v City of Elmira, while Vehicle and Traffic Law § 1104 accommodates an officer's need to swiftly respond to emergencies, "the [l]egislature retains and recognizes the potential for liability as a protection for the general public against disproportionate, overreactive conduct" (84 NY2d 505, 512-513 [1994]). As a result of the legislature's careful balancing and "calibrated formulation," determining whether the driver of an emergency vehicle's conduct meets the recklessness standard under Vehicle and Traffic Law § 1104 "is not always or easily resolvable as a matter of law without some appropriate fact-finding forum and process, any more than simple negligence usually is" (id. at 513). As the Court stated in Campbell,
"The more rigorous statutory test before allowing liability thus retains some incentives for moderating and deescalating the already dangerous situations when emergency personnel are engaged in their valiant and important services. Thus, while the [l]egislature shields municipalities from simple negligence and mere errors in judgment, it also protects innocent victims and the general public by expressly not relieving emergency operators and their municipal employers of all reasonable care" (id.).
Under Vehicle and Traffic Law § 1144, "[u]pon the immediate approach of an authorized emergency vehicle" displaying emergency red lights and sounding audible warning signals,
"the driver of every other vehicle shall yield the right of way and shall immediately [move] to the right-hand edge or curb of the roadway, or to either edge of a one-way roadway three or more lanes in width, clear of any intersection, and shall stop and remain in such position until the authorized emergency vehicle has passed, unless otherwise directed by a police officer" (Vehicle and Traffic Law § 1144 [a]).
Even while the legislature imposed requirements on drivers to yield to emergency vehicles, it reaffirmed the emergency vehicle driver's standard of care reflected in Vehicle and Traffic Law § 1104 and provided that section 1144 "shall not operate to relieve the driver of an authorized emergency vehicle from the duty to drive with reasonable care for all persons using the highway" (id. § 1144 [b]).
Viewing defendants' summary judgment motion in the light most favorable to the nonmovant plaintiffs, defendants failed to carry their burden to establish that the driver's actions did not constitute reckless behavior as a matter of law. As the dissenters below explained, there are disputed material issues of fact and credibility that preclude summary judgment. Namely, there are questions of fact as to whether the driver activated their emergency lights or sounded their air horn, and whether the driver's sight lines were obstructed when entering the intersection.[FN*]
With respect to precautionary measures, the driver of the emergency vehicle testified "that she had her emergency lights on and was using her air horn" (237 AD3d 1594, 1597 [2025] [Bannister and Nowak, JJ., dissenting]). However, as the dissenting Justices below stated,
"[B]oth plaintiffs testified . . . that they did not see emergency lights and never heard sirens or a horn prior to the impact. The deputy driving the second patrol vehicle testified at his deposition that he believed [the driver] turned on her vehicle's emergency lights when she stopped at the intersection just before entering against the red light, but [that he] never heard a siren being activated. The deputy driving the third patrol vehicle testified at her deposition that she could not recall [the driver] activating her emergency lights until [the driver's vehicle] reached the intersection and never heard sirens . . . . [B]oth [deputies] testified that they did not recall her using her [*7]vehicle's siren or air horn when entering the intersection" (id. at 1597).
With respect to the potentially obstructed sight lines, the driver testified during deposition that she " 'believe[d]' that the intersection was clear" (237 AD3d at 1597). By contrast, plaintiff Gary Granath testified "that he was familiar with the intersection from his work as a school bus driver and that three of the corners have obstructed views, which could have made it impossible for [the driver of the emergency vehicle] to properly evaluate the propriety of entering the intersection" (id. at 1598). Similarly, Seargent Mackenize, who investigated the collision, testified that he believed that both drivers "were dealing with the southbound Turk Hill Road left turn lane being occupied. So that would have obstructed [the driver of the emergency vehicle's] view to the right and it would have obstructed Mr. Granath's view to the left as they were traversing through the intersection."
In sum, there were material questions of fact as to whether and when the driver initiated their lights and air horn before entering the intersection, and whether the intersection's layout (and the lane of southbound cars) obstructed the driver's view of plaintiffs' vehicle and other oncoming traffic.
The majority misapplies our summary judgment standard and ignores the disputed material facts and questions of credibility that cannot be decided based on defendants' submissions. The majority's conclusion is even more perplexing given that it assumed that the driver "failed to activate her air horn or siren, call in a 'Code 77,' or observe southbound traffic—either because her view was obstructed or she neglected to look to her right" (majority op at 7). If the driver entered the intersection immediately after activating the warning signals, without giving oncoming traffic sufficient time to see or hear those warnings, and the driver's view of the intersection was obstructed as the record describes, a jury could conclude that the driver's behavior was reckless.
The Vehicle and Traffic Law insulates authorized emergency vehicle drivers from liability for conduct short of recklessness. The legislature limited liability only to that extent because reckless conduct places all surrounding drivers, passengers, and pedestrians at risk. To insulate authorized emergency vehicle drivers from the consequences of even their reckless driving upsets the careful policy balance that the legislature struck, as it eliminates "incentives [to] moderat[e] and deescalate[e] the already dangerous situations [in which] emergency personnel" carry out their critical services (Campbell, 84 NY2d at 513). Reckless conduct, as in this case, also delays or prevents the emergency vehicle driver from responding to an emergency call—the very justification for exempting these drivers from following the rules of the road in the first place.
The parties here dispute exactly what the driver did and when. It is necessary to resolve those disputed matters to determine whether the driver acted recklessly. Therefore, on this record and in accordance with our summary judgment standard, whether the driver's behavior crossed the statutory line and constituted recklessness is a question for the trier of fact.
I dissent.
Order affirmed, with costs. Opinion by Chief Judge Wilson. Judges Garcia, Singas, Cannataro, Troutman and Halligan concur. Judge Rivera dissents in an opinion.
Decided March 19, 2026

Footnotes

Footnote 1: During oral argument the Granaths conceded that Deputy Fong turned on her emergency lights before entering the intersection.

Footnote 2: Although there was testimony that MCSD policy requires deputies driving while engaged in an emergency operation to use their emergency lights and sirens, Sergeant MacKenzie, "an instructor for the [MCSD's] emergency vehicle operations course," testified that MCSD has "no [such] policy."

Footnote 3: Although we disagree with the Appellate Division that "any deposition testimony suggesting that [Deputy] Fong's view may have been obstructed is speculative and insufficient to raise a triable issue of fact" (237 AD3d at 1595), even taking the testimony of Mr. Granath and Sergeant MacKenzie as true, and with the other facts in a light most favorable to the Granaths, as a matter of law Deputy Fong's conduct does not rise to the level of reckless disregard (see Saarinen, 84 NY2d at 502).

Footnote 4: Vehicle and Traffic Law § 1104 (c) requires fire trucks exercising subsection (b)'s driving privileges, which includes crossing with a red light, to use "audible signals . . . while in motion . . . as may be reasonably necessary" and, if equipped with emergency lights, to use "at least one red light."

Footnote 5: The legislative history of subsection (c) indicates that the exemption for police vehicles was enacted because those vehicles "may need to approach suspected criminals without giving advance notice" and should be used "only when it is absolutely necessary in the performance of their duties" (1957 Revision Note, reprinted in McKinney's Cons Laws of NY, Book 62A, Vehicle and Traffic Law § 1104 § at 458 [1960 ed]; see also Rep of Joint Leg Comm on Motor Veh Problems, 1954 NY Legis Doc No. 36 at 37). No party has mentioned that legislative history, and accordingly, we do not opine on its relevance, if any.

Footnote *: Plaintiffs did not claim that there is an additional disputed question regarding whether Vehicle and Traffic Law § 1104 privileges even applied to defendants here given that the authorized emergency vehicle was a deputy sheriff's car. While an emergency vehicle operating as a police vehicle automatically qualifies for Vehicle and Traffic Law § 1104 privileges, other vehicles—such as a deputy sheriff vehicle—must use an audible signal and be equipped with at least one lighted lamp before the statutory privileges apply (Vehicle and Traffic Law § 1104 [c], [d]). Because the vehicle here was a deputy sheriff's car, plaintiffs might have argued that Vehicle and Traffic Law § 1104 privileges did not apply because the record failed to establish that the driver activated an audible signal and that the vehicle was equipped with a lighted lamp, as statutorily required.